## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MARCO MORALES,

     Plaintiff,

v.                                  Case No: 8:13-cv-184-T-30TBM
                                   Crim. Case No: 8:12-cr-119-T-30TBM

UNITED STATES OF AMERICA,

     Defendant.

_____

## ORDER

THIS CAUSE is before the Court upon the motion of Marco Morales filed pursuant to 28 U.S.C. § 2255 (Dkt. #1) and the Government's response (Dkt. #5). Upon review, the Court concludes that the motion should be denied because the grounds raised are procedurally barred or lack merit.

## Background

Morales entered an open plea of guilty on April 19, 2012, to one charge of wire fraud in violation of 18 U.S.C. § 1343. The facts of the offense, to which Morales admitted at his change of plea hearing (and again at sentencing) were:

> MR. GAUGUSH: If this case were to proceed to trial, the United States would prove the following facts beyond a reasonable doubt, which are contained at document - - or Docket Number 6, pages 2 through 7.

> To summarize those, E*TRADE FINANCIAL CORPORATION was a global financial services company, offering a wide range of financial services to consumers, including online investing and trading. E*TRADE primarily provided products and services such as online trading through its Internet website www.etrade.com. Through its website, E*TRADE

allowed customers to establish and conduct trades in online brokerage accounts or otherwise known as investment accounts.   These online brokerage accounts enabled E*TRADE customers to access and make trades using the Internet.

In particular, E*TRADE offered customers the ability to conduct online options, trading through one or more brokerage accounts.  Once a customer established an online brokerage account with E*TRADE, the account could be funded by linking a bank account to the E*TRADE brokerage account.   This approach to funding allowed the E*TRADE account holder to electronically transfer funds from their bank account to their E*TRADE brokerage account using the Internet.

Generally, when this happened, those funds were held for five business days.  However, brokerage accounts with an RSA digital token account activated prior to April 1st, 2007, were excluded from this general electronic funds transfer hold policy, therefore granting the account holder immediate access to funds.

Between September 26th, 2006 and May 2nd, 2007, the Defendant, Marco Morales, engaged in a scheme to defraud E*TRADE by taking advantage of the above-described loophole in their funds transfer hold policy.  Morales opened E*TRADE - - an E*TRADE brokerage account, and between June and July of 2006, he deposited about $140,000 into that account.  However, by January of 2007, he had lost the entire amount of money in risky options trading.

On or about January 31st of 2007, Mr. Morales initiated a $100,000 electronic funds transfer from his linked Wachovia Bank account to his E*TRADE brokerage account.   At the time this transfer was made, Mr. Morales had about $32 in his bank account.

Relying upon Morales' materially false representation that he had $100,000 being transferred into his E*TRADE brokerage account, E*TRADE permitted Morales to purchase tens of thousands of dollars worth of options with his brokerage account.  Mr. Morales did this two more times, once on February 1st, and the second on February 2nd of 2007.

By February 8th of 2007, all three electronic funds transfers were returned due to insufficient funds and E*TRADE suspended Mr. Morales' account, and sold these options at a loss.   Because of Mr. Morales' fraudulent activity in his own E*TRADE accounts, he could no longer conduct options trading in that account, so he approached friends and acquaintances and convinced them he was an experienced options trader

and offered to open up accounts in their names, made trades and share in the proceeds.  A number of individuals agreed to this arrangement.

Mr. Morales' scheme involving these nominees followed the basic pattern.  It included obtaining biographical information of the nominees, opening up an E*TRADE brokerage account in their names, selecting the user name and password for those accounts, obtaining an RSA digital token for those accounts, and also opening and obtaining a bank account to which he could link the nominees' E*TRADE brokerage accounts to.

Mr. Morales in some instances even deposited nominal funds such as $100 into the bank accounts.  After linking the nominees' bank accounts to the brokerage account, he would then go online and initiate electronic funds transfers in tens of thousands of dollars from the nominees' accounts at Wachovia Bank to the E*TRADE brokerage account knowing that the bank account had little or no funds.

By way of example, on February 18, 2007, Mr. Morales assisted an acquaintance referenced as Nominee A.T. with opening an E*TRADE brokerage account.  On February 27, 2007, Mr. Morales assisted that same individual with opening a bank account.  On April 18, 2007, Mr. Morales initiated a bogus $100,000 electronic funds transfer from Nominee A.T.'s Wachovia Bank account to Nominee A.T.'s E*TRADE brokerage account knowing full well there were insufficient funds in this bank account to cover the $100,000 funds transfer.  In fact, at the time Mr. Morales initiated this funds transfer, Nominee A.T. has about .92 in that account.

This bogus $100,000 electronic funds transfer initiated by Mr. Morales was routed by wire from Morales' home computer in the Middle District of Florida to E*TRADE SECURITIES, LLC's computer server in Alpharetta, Georgia.  But for this bogus electronic funds transfer, E*TRADE would not have permitted Morales to purchase tens of thousands of dollars in options with Nominee A.T.'s E*TRADE brokerage account.  As a result of this specific example of fraud, Nominee A.T.'s E*TRADE brokerage account suffered a loss of over $136,000.

THE COURT:        Is there restitution going to be owed?

MR. GAUGUSH:   Yes, Your Honor.  And that's something that the parties have discussed prior to this hearing, afterward we'll have to litigate the actual amount.

THE COURT:        All right.

Mr. Morales, that's a fairly good detailed account of your alleged scheme here.  Was that an accurate statement of what you did?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:        And is there anything stated by Mr. Gaugush that you disagree with or you think is incorrect?

THE DEFENDANT:        No, Your Honor.

THE COURT:        You're not required to, but is there anything you want to add to the facts at this point?

THE DEFENDANT:        No, Your Honor.

Transcript of change of plea hearing (Dkt. #33), pp. 22-26, criminal case 8:12-cr-119-T-30TBM.

Morales asked for a new lawyer on direct appeal and the Federal Public Defender's office was appointed.  Subsequently, Morales filed a motion to withdraw his appeal and it was dismissed.

On January 17, 2013, Morales timely filed his § 2255 petition with this Court raising the following grounds:

(1)    the guilty plea should be set aside because Morales was under the influence of prescribed narcotics at the time of the hearing;

(2)    the offense of conviction was barred by the statute of limitations;

(3)    the calculation of the loss amount was erroneous; and

(4)    counsel was ineffective for allowing me to sign a tolling agreement and for improperly calculating the amount of loss.

### Discussion

**Ground One:**        The guilty plea should be set aside because Morales was under the influence of prescribed narcotics at the time of the hearing.

In support of ground one, Morales states:

> On 4/19/12 when I was scheduled to appear before the court just six days after having surgery I was under the influence of Oxycodone.  I was processed by the Marshall, where I was finger printed and my picture taken.  Then I was given a drug test and it was positive for narcotics.  When I appeared in court later that afternoon I was dozing in and out.  I could not stand alone and was in a wheelchair.  Under the medication I was taking, I could not process everything that was told to myself, furthermore my attorney said to go along and agree to get it over with.  When I was in court and asked if I was under any drugs and I replied no that was incorrect and I thought I answered yes.  I could not process all the information at the time because I was groggy from the medication.  It was only after receiving the transcripts and reading them, did I see what was asked of me by the Magistrate Judge and what my responses were, and they were incorrect.

Petition (Dkt. #1), p. 4.

Before taking his guilty plea, the Magistrate questioned Morales closely about his mental clarity and whether he was on medication.   Morales, under oath, told the Magistrate that he had taken no medication of any kind on the day of the guilty plea hearing and, in fact, had not taken any medication since his day of surgery, Friday, April 13th, six days before the guilty plea hearing.   The Magistrate asked the following questions and made a finding of fact as to Morales' mental clarity:

> MR. HOLLANDER:   Judge, I understand he has not taken his meds today, which obviously puts him in increased pain, but he's not - - has not taken his medication today.

> THE COURT:   Okay.  And I hadn't got to that point.  What type - - but let's back up.   You say you have a mental disability; what is the diagnosis?

> THE DEFENDANT:   I suffer from paranoid schizophrenia.  I suffer from a paranoid personality trait and a bipolar depression.

> THE COURT:   Okay.  Now, is this something that was developed as a result of your service or did it precede that?

THE DEFENDANT:   It resulted as me being in the service, Your Honor.

THE COURT:  All right.

You on some type of disability from the service?

THE DEFENDANT:   Yes, Your Honor.

THE COURT:   Okay.   Now, your treatment involves what; they give you medication?

THE DEFENDANT:   Give me medication, Your Honor, and I see a psychiatrist.

THE COURT:   All right.  You do that through the VA?

THE DEFENDANT:   I do that through the VA, Your Honor.

THE COURT:   Okay.   Can you tell me what psychotropic medicines or other medicines they give you for your mental condition?

THE DEFENDANT:   They give me Risperdal, they give me Trazodone and they also give me Anaproxin.

THE COURT:   Have you had any of that medicine today?

THE DEFENDANT:   No, I haven't had any of that medicine today, Your Honor.

THE COURT:   Apparently you are also taking some pain medicine for your leg?

THE DEFENDANT:   Yes, Your Honor.

THE COURT:   What kind of medicine is that?

THE DEFENDANT:   They prescribed for me for the surgery, Oxycodone 325, and I haven't had any of that medicine nor have I had my leg elevated, so my leg is turning greenish, Your Honor.

THE COURT:   Okay.  Well, can we elevate your leg while you're sitting there?

MR. HOLLANDER:   It's as high as it can go, Judge.  There is one other medication that the psychiatrist has prescribed, that's Depakote.

THE COURT:   Okay.  All right.

Now, when was the last time you took any of these psychotropic drugs, the Risperdal, Depakote, any of those medicines; when was the last time you took those?

THE DEFENDANT:   Uh, the last time I took them is right before surgery.

THE COURT:   Which was how long ago?

THE DEFENDANT:   Friday the 13th, because Friday the 13th I had surgery, then when I went to fill my prescription, I took my prescription to CVS and they couldn't get any pain medication for me till Sunday.

THE COURT:   Okay.  You're answering questions quite coherently, and they're quite responsive, so I'm thinking you're okay to go forward with the plea today.  But if you have any questions about whether or not you should go forward today, any circumstances, you know, we can put this off to another day.

THE DEFENDANT:   No, Your Honor, it's perfectly well to get it done today.

Transcript of guilty plea hearing (Dkt. #33), pp. 6-8, criminal case 8:12-cr-119-T-30TBM.

The Magistrate's finding of fact that Morales' answers were coherent and responsive is well founded.  A reading of the entire guilty plea transcript reveals to this Court that Morales was indeed answering questions directly with no indication of difficulty in understanding.  Having sworn to be under no effects of medication at the

time of the guilty plea hearing, Morales will not now be heard to claim to the contrary.

This ground fails for lack of merit.

**Ground Two:**          The offense of conviction was barred by the statue of limitations.

In support of ground two, Morales states:

> Mr. Hollander had me sign a paper in his office on 2/20/12 without fully
> disclosing the first page of the Tolling Agreement, and explaining to me
> what I was signing and what this paper he had me sign was really about, he
> only let me see the second page and told me to sign it.  The last transaction
> on my account which was on my indictment papers were explaining
> transactions that took place in January and February 2, 2007.  Which the
> dollar amounts went beyond the five year statute.  And would have run out
> because the Tolling Agreement was not signed till 2/20/12 And since the
> agreement was not signed till 2/20/12 the amounts should have not been
> factor.

Petition (Dkt. #1), p. 5.

Morales claims that his offense is barred by wire fraud's five year statute of
limitations.  He is mistaken.  He was charged with conducting a fraudulent scheme
between September 26, 2006, through May 2, 2007.  As explained in the factual portion
of his guilty plea hearing, one of his transactions occurred on April 18, 2007, in which he
initiated a bogus $100,000 electronic funds transfer from Wachovia Bank to a nominee's
E*TRADE account knowing that there were insufficient funds in the account to cover the
transfer.  The Indictment was returned by the Grand Jury on March 28, 2012, within five
years from the date of the April transaction.  This is true without regard to the Tolling
Agreement Morales executed on February 20, 2012.

Since the Indictment was brought within the five year statute of limitations, this
ground fails for lack of merit.

**Ground Three:**        The calculation of the loss amount was erroneous.

In support of ground three, Morales states:

> From day one the dollar amount was wrong and I was arguing it was
> wrong.  None of the figures were put into account.  Only the losses, were
> taken into account.  There was Glenn Scott Nolen' account that had a profit
> of $224,130.00 on trades that were placed on 4/19/06 to 4/21/2006.  Etrade
> never released the money and they received the $100,000.00, the money
> was taxed but never released.  Nigel Martin's account had a profit of
> $85,000.00 and never released that took place in 4/25/07 to 4/26/07 with
> those numbers added together it would have been $309,130.00 those
> numbers were never taken into account the positions were brought to open
> and sold to close.  My Attorney said he would handle the matter of the
> surplus and never handled it, nothing was done.  I contacted the SEC on the
> matter on 7/12/12.  The SEC contacted me on 7/13/12 the call was recorded
> by them. They wanted me to send an email and description of the problem.
> Prior to being sentenced, my Attorney Lee Hollander said he would handle
> the figures and never brought it to the courts attention.  The dollar amount
> should have been a surplus of $172,295.49  The SEC stated that if the
> trades were fraudulent they would of have the orders rescinded and null
> voided.

Petition (Dkt. #1), p. 7.

First, this claim is procedurally barred because it should have been raised on direct

appeal.  Morales challenges the calculation of restitution, not the validity of his sentence.

A habeas proceeding under 28 U.S.C. § 2255 is to challenge the validity of a sentence,

not evidentiary issues that should have been resolved on direct appeal.  *Williams v. U.S.*,

365 F. 2d 21 (7th Cir. 1966), *cert. denied*, 385 U.S. 981 (1966).  Morales filed a direct

appeal but then voluntarily dismissed it.  Therefore, Morales has waived this ground

because he did not pursue it to completion on direct appeal.

Second, even if it had not been waived, it would have failed on the merits.  At his

sentencing hearing, Morales admitted the facts contained in the pre-sentence report.  *See*

Sentencing Transcript (Dkt. #36), p. 3, criminal case 8:12-Cr-119-T-30TBM.  The pre-sentence report clearly sets forth the amount of loss in paragraph 17 to be $374,178.60.  Originally, the loss was calculated at $536,571.26.  Morales was given credit for some accounts in which he actually earned a profit, and the Court reduced his loss to the amount shown in paragraph 17 of the pre-sentence report.  By admitting the specific loss amount under oath at sentencing, Morales will not now be heard to claim to the contrary.  This ground fails because it is procedurally defaulted, and had it not been, would have failed on the merits.

**Ground Four:**   Counsel was ineffective for allowing me to sign a tolling agreement and for improperly calculating the amount of loss.

The law regarding ineffective assistance of counsel claims is well settled and well documented.  In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.   Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687.

*Strickland* requires proof of both deficient performance and consequent prejudice. *Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When applying *Strickland*, we

are free to dispose of ineffectiveness claims on either of its two grounds."). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. at 690. *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id*. at 690.

Petitioner must demonstrate that counsel's error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691-92. To meet this burden, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

In support of ground four, Morales argues:

> Mr. Hollander had me sign a paper in office on 2/20/12 without fully disclosing the first page of the Tolling Agreement, and explaining to me what I was signing and what this paper he had me sign was really about, he only let me see the second page and told me to sign it. The last transaction on my account which was on my indictment papers were explaining transactions that took place in January and February 2, 2007. Which the dollar amounts went beyond the five year statute. And would have run out because the Tolling Agreement was not signed till 2/20/12 And since the agreement was not signed till 2/20/2012 the amounts should not have been factor.

> From day one the dollar amount was wrong and I was arguing it was wrong. None of the figures were put into account. Only the losses, were taken into account. There was Glenn Scott Nolen' account that had a profit of $224,130.00 on trades that were placed on 4/19/06 to 4/21/2006. Etrade never released the money and they received the $100,000.00, the money was taxed but never released. Nigel Martin's account had a profit of $85,000.00 and never released that took place in 4/25/07 to 4/26/07 with those numbers added together it would have been $309,130.00 those numbers were never taken into account the position were brought to open and sold to close. My Attorney said he would handle the matter of surplus and never handled it, nothing was done.
>
> Under the influence of prescribed narcotics, my lawyer knew I was under prescription medicine.

Petition (Dkt. #1), p. 8.

Ground four fails because Morales has not shown deficient performance on the part of his counsel, nor has he shown resulting prejudice. Counsel did have Morales sign a Tolling Agreement but, even without the Tolling Agreement, the criminal charge in this case was not barred by the statute of limitations and therefore it had no effect.

As to Morales' claims about restitution, he is incorrect about his lawyer's performance. His lawyer was successful in convincing the Government to reduce the loss amount from $536,571.26 to $374,178.60. This is the amount admitted at sentencing by Morales as being accurate. Pre-Sentence Report, par. 17, p. 6, criminal case 8:12-cr-119-T-30TBM. He cannot now overcome his admission by attempting to clothe this factual issue as an ineffective assistance of counsel claim. Ground four fails for lack of merit.

Because all claims raised in the petition lack merit or are procedurally barred, the petition must be denied. It is therefore

ORDERED AND ADJUDGED:

1.      The motion to vacate, set aside or correct sentence (Dkt. #1) is DENIED.

2.      The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff.

3.      The Clerk is directed to close this case.

4.      The Clerk is directed to terminate the pending motion to vacate, set aside or correct sentence (CR Dkt. #44) in the related criminal case (8:12-cr-119-T-30TBM).

CERTIFICATE OF APPEALABILITY AND LEAVE TO
APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that Petitioner is not entitled to a certificate of appealability.  A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition.  28 U.S.C. § 2253(c)(1).  Rather, a district court must first issue a certificate of appealability.  *Id.*  "A certificate of appealability may issue … only if the applicant has made a substantial showing of the denial of a constitutional right."  *Id.* at § 2253(c)(2).  To make such a showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Miller-Elv v. Cockrell*, 537 U.S. 322, 335-36 (2003)(quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)).  Petitioner has not made the requisite showing in these circumstances.

Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE** and **ORDERED** in Tampa, Florida, this 18th day of July, 2013.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record

F:\Docs\2013\13-cv-184 deny 2255.docx